## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ANTOINE JOHNSON                                        CIVIL ACTION

VERSUS                                                 NO. 11-1382

WARDEN LYNN COOPER                                     SECTION "G" (6)

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of

conducting hearings, including an evidentiary hearing, if necessary, and submission of

proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B)

and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon

review of the entire record, the court has determined that this matter can be disposed of

without an evidentiary hearing.   For the following reasons, it is hereby recommended that

the instant petition be **DISMISSED WITH PREJUDICE**.

## I.  PROCEDURAL HISTORY[1]

On February 2, 2004, the State charged petitioner, Antoine Johnson, with two counts

---

[1]A portion of the procedural history was taken from the Louisiana Fourth Circuit's
opinion, *State v. Johnson*, 33 So.2d 328 (La. App. 4 Cir. 2010).

of attempted second degree murder, violations of La. R.S. 14:30.1.  On February 11, 2004, petitioner pled not guilty at his arraignment.  On May 7, 2004, the trial court found no probable cause to substantiate the charges against petitioner and granted his motions to suppress the evidence and identification.[2]  On June 23, 2004, the trial court vacated its earlier rulings, heard testimony on petitioner's motions to suppress the evidence and identification, found probable cause, and denied the motions.  On November 27, 2007, a jury trial commenced.  On November 28, 2007, the jury found petitioner guilty as charged on both counts.

In December 2007, petitioner filed both a motion for mistrial and a motion for new trial based on juror misconduct.  Also in December 2007, he filed a motion for post judgment acquittal.  On December 20, 2007, the trial court denied all three motions.  On the next day, the trial court sentenced petitioner to serve twenty years at hard labor on each count, sentences to run concurrently, with credit for time served.  As a condition of sentencing, the trial court ordered petitioner to obtain a GED and recommended work release for the last six months of his prison term.  On January 18, 2008, petitioner filed a motion to reconsider sentence.  On September 11, 2008, the trial court denied petitioner's motion to reconsider, but granted his motion for appeal.

---

[2]The State filed a writ application which the Louisiana Fourth Circuit Court of Appeal granted.  (No. 2004-K-0873).

On February 10, 2010, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's convictions and sentences. *State v. Johnson*, 33 So.3d 328 (La. App. 4 Cir. 2010). Thereafter, the Louisiana Supreme Court denied petitioner's writ application. *State v. Johnson*, 46 So.3d 1267 (2010).

Petitioner did not seek post-conviction relief in the state court system, but rather, filed the instant habeas corpus petition. In his habeas application, petitioner sets forth the following claims: 1) The evidence was insufficient to support his conviction; 2) he was denied his right to confront and cross-examine his accuser, James Aldridge; 3) the jury was guilty of misconduct by virtue of their viewing, during deliberations, enhanced footage of the surveillance videotape of the shooting; and, 4) he was denied full appellate review because the voir dire transcript was incomplete due to the fact that it did not include what transpired during the bench conferences.

The State concedes that the instant action is timely and that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). Accordingly, the court shall proceed to address the merits of petitioner's claims following its review of the pertinent facts and applicable standard of review.

## II. FACTS[3]

On the evening of July 26, 2003, Sam Davis and Michael Martin were shot by three assailants at the TCL Carwash located on Louisiana Avenue. Surveillance cameras at the carwash captured the incident.

Mr. Davis arrived at the carwash between 6:00 p.m. and 7:00 p.m. to wash his white Monte Carlo. Mr. Davis' friend, Michael Martin, arrived at the carwash about one hour later. Shortly thereafter, Mr. Davis and Mr. Martin were ambushed by gunfire. Mr. Davis was shot in his right shoulder and fell to the ground. Mr. Davis remained on the ground until the shooting stopped. Mr. Davis and Mr. Martin then both ran from the area to a nearby post office. Mr. Davis noticed that Mr. Martin had been shot in his leg. Both victims were transported to the hospital. Later, a police officer met with Mr. Davis at the hospital and showed him the surveillance video and a photo lineup. Mr. Davis told the officer that he did not know his assailants and that he did not know of any reason why anyone would shoot him. After viewing the video and photographs, Mr. Davis picked out a person from the photo lineup.

Ms. Natasha Hutchinson lived across the street from the carwash. On the evening of the shooting, she and a friend were in her backyard working on a shed. When she heard

---

[3]The facts are taken from the Louisiana Fourth Circuit Court of Appeal's opinion, *Johnson,* 33 So.2d at 330-334.

gunshots, she dropped to the ground until the shooting stopped.  She ran into her house and looked out the front window in the direction of the carwash.  In her living room, she noticed that a window was broken and a bullet was on the floor.  Ms. Hutchinson called the police and went outside with neighbors.  Ms. Hutchinson did not see any of the shooters.  However, she observed the following:  several of the cars parked on the street had broken windows and bullet holes in them; blood was on her driveway as well as on the sidewalk leading to the post office; and her next door neighbor's house was sprayed with gunfire.

Mark Georgieff, the carwash owner, met with the police at about 9:00 p.m. on the night of the shooting.  He supplied the police with a copy of three recordings of the shooting made by the carwash surveillance cameras and nineteen still images made from the video.  He explained that although several surveillance cameras were working on the premises (the carwash has sixteen surveillance cameras on the exterior area), not all of the cameras captured the shooting.  He identified in court the video depictions and still images that he made for the police.  Mr. Georgieff testified that the video and some of the still images depict three men running from the back of the carwash to the front shooting guns.  One of the shooters was using an AK–47 rifle.  Mr. Georgieff was unable to identify any of the shooters.

Officer Alex Brady of the New Orleans Police Department ("NOPD") was dispatched to the carwash to handle the initial investigation.  He observed numerous spent bullet casings

and two blood trails.  He also observed a white Monte Carlo parked on the sidewalk in front of the carwash with several bullet holes and both the side and rear windows shot out.  Officer Brady investigated bullet holes in two houses across the street from the carwash.  He learned from a detective at the scene that the victims, Mr. Davis and Mr. Martin, had already been transported to the hospital.  His investigation concluded with the writing of a report documenting the incident, recording his findings at the scene, and noting that crime lab technicians photographed the shooting scene.  Officer Brady neither received a description of the shooters nor spoke to any witnesses.

NOPD Sergeant Lawrence Dupree assisted Sergeant Hochman and Mr. Georgieff in obtaining video surveillance of the carwash from Mr. Georgieff's residence.  Detective Dupree was present when the downloads of the surveillance video and still photos of the shooting at the carwash were made.  He explained that not all of the surveillance cameras captured the shooting incident and that only copies from the cameras which did record the incident were obtained by the police.  Detective Dupree turned the evidence over to Sergeant Jeffrey Hochman.

Sergeant Hochman was assigned to the FBI joint task force investigation of the carwash shooting.  He arrived on the scene about thirty minutes after the shooting.  He observed a gold Maxima and white Monte Carlo, each with several bullet holes, parked at

the carwash. He also observed bullet casings scattered about the area and blood trails on the sidewalk. A neighbor in the area directed him to the carwash owner to obtain copies of the surveillance video. Sergeant Hochman viewed the video that night. According to Sergeant Hochman, the video depicted three subjects walking through the carwash firing long-barreled assault weapons. Sergeant Hochman learned from Officer Philibert, who had been canvassing the area for evidence, that an assault rifle had been located on the back street adjacent to the carwash. When Sergeant Hochman met with the victims in the hospital, neither victim was able to identify any of the shooters.

The NOPD distributed the surveillance video to local news media for public viewing. As a result of the public viewing, the police received multiple crime stoppers tips and were able to trace the recovered firearm to Paul Pierce, who was the cousin of Kendell Washington and Elton Hook. Mr. Pierce identified Mr. Washington and Mr. Hooks from still photos made from the video; however, he was unable to identify the third suspect. Mr. Pierce sold the weapon the police recovered at the scene to his cousin, Raynell Cole. Sergeant Hochman also spoke with Ms. Wilhemina Cole, who was the grandmother of Mr. Hooks and Mr. Washington. Ms. Cole also identified Mr. Hooks and Mr. Washington.

At the United States Attorney's Office, Sergeant Hochman met with James Aldridge, who was in federal custody for drug and weapon charges. Mr. Aldridge identified the three

suspects depicted in the carwash surveillance video.  Through further investigation, Sergeant

Hochman identified Mr. Washington as the subject wearing a white striped shirt and hat in

the video; Mr. Hooks as the individual in the foreground wearing a long-sleeved T-shirt; and

Mr. Johnson as the individual in the background running with Mr. Hooks and Mr.

Washington.   As a result of the identifications, the NOPD arrested Mr. Hooks, Mr.

Washington (who was already in police custody on another charge), and Mr. Johnson.  Mr.

Hooks admitted his complicity in the shooting to police at the time of his arrest.  He also

named Mr. Washington as a participant.

Lieutenant Christy Williams received still photos and copies of surveillance videos

from Sergeant Hochman.  She logged these items into evidence and placed them into Central

Evidence and Property.

The parties stipulated that if called to testify Officer Warren Spears would verify that

the NOPD evidence room flooded during Hurricane Katrina.

Tarez Smith, a NOPD crime scene technician, received instructions from Sergeant

Hochman concerning collection of evidence at the shooting scene.  She recounted at trial that

she retrieved a spent bullet that was collected from the floor of the front room of the house

located across the street from the shooting scene.  She also identified twenty-eight spent

bullet casings collected from the shooting scene plus an indeterminate number of "Wolf"

shell casings, additional shell casings, a lead fragment, blood samples, a Norelco SKS rifle, and nine other spent casings.

Officer Kenneth Leary, a firearms specialist, compiled a report on the weapon and spent casings retrieved from the crime scene.  He examined a Norinco 7.62 by 39 millimeter semi-automatic assault rifle, SKS model, serial No. V 1214 retrieved from the scene.  He also examined a Remington 12–gauge pump shotgun retrieved from under the house at 2121 Franklin Court.  He also examined several rifle casings recovered from the shooting scene.  Officer Leary's testing indicated that eleven of the bullet casings were fired from the Norinco rifle.  The bullet casings were then scanned into the Integrated Ballistic Identification System and returned to Central Evidence and Property.

The trial court, out of the presence of the jury, examined Mr. Aldridge regarding his invocation of his Fifth Amendment right not to testify at trial.  The trial court declared Mr. Aldridge unavailable for trial, and a law clerk read the transcript of Mr. Aldridge's testimony at a pre-trial hearing motion into the record.  At the pre-trial hearing, Mr. Aldridge testified that he was currently in federal custody after entering into a plea agreement in federal court for drug and weapon (carrying a gun while drug trafficking) charges.  Although he pled guilty before meeting with any government agent about the carwash shooting, he acknowledged that he was testifying in the hope that his cooperation would lessen his

sentence on the federal charges.

Mr. Aldridge, who was twenty-one years old at the time of the pre-trial hearing, began selling drugs at the age of fifteen. On May 20, 2003, he was arrested on the federal drug and weapon charges. He testified that he knew Mr. Washington, Mr. Hoods, and Mr. Johnson and that he saw them daily up until his arrest. Mr. Aldridge stated that he was a long time friend of petitioner and that he kept in touch with petitioner through phone calls from prison. According to Mr. Aldridge, in 2003 a gang, called the Third and Galvez Boys, killed his godbrother, LaDevin Pierce. After Mr. Pierce's death, Mr. Aldridge spoke with petitioner who informed that he was going to kill the individual responsible for killing Mr. Pierce. After the conversation and while in jail, Mr. Aldridge saw the surveillance video on the news of the carwash shooting. At the pre-trial hearing, the video was played for Mr. Aldridge in court. He identified Mr. Hooks as the individual depicted on the video wearing a black shirt, gray undershirt and blue jeans; Mr. Washington as the individual wearing a blue and white baseball cap, striped shirt, and black shorts; and petitioner as the individual wearing a black T-shirt, blue shorts, and white tennis shoes. Mr. Aldridge identified petitioner both by his image and by the clothing he wore, noting that he (Mr. Aldridge) purchased the blue shorts petitioner was seen wearing in the video. Mr. Aldridge testified that after the carwash shooting he had further conversations with petitioner in which petitioner admitted to his

10

participation in the carwash shooting.  Mr. Aldridge further testified that petitioner admitted that he, Mr. Washington, and Mr. Hooks fired upon the wrong people.

Dr. Ellen Slaven, an emergency physician at Charity Hospital, testified that she treated the two victims on the night of the shooting.  Dr. Slaven described Mr. Martin's injuries as multiple gunshot wounds to his right forearm, thigh, scrotum, and flank; and she described Mr. Davis' injuries as a through and through gunshot wound to his right shoulder with lacerations on his chin and over his left eye.

The defense's sole witness was Powell Miller of the New Orleans Public Defenders Office.  Mr. Miller testified that earlier in this case he represented petitioner in his capacity as a public defender.  In his capacity as petitioner's attorney, Mr. Miller interviewed Mr. Aldridge after the pre-trial hearing.  Mr. Aldridge indicated to Mr. Miller that he testified against petitioner at the pre-trial hearing because he believed that petitioner was safer in prison than on the streets.  Mr. Miller acknowledged that he never questioned Mr. Aldridge about whether his motion hearing testimony was untruthful.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions

of fact, questions of law, and mixed questions of law and fact.  Provided that the state court

adjudicated the claim on the merits, pure questions of law and mixed questions of law and

fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).

*Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer

to the state court's decision unless it "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have
> independent meaning.  A federal habeas court may issue the writ under the
> "contrary to" clause if the state court applies a rule different from the
> governing law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court may grant
> relief under the "unreasonable application" clause if the state court correctly
> identifies the governing legal principle from our decisions but unreasonably
> applies it to the facts of the particular case.  The focus of the latter inquiry is
> on whether the state court's application of clearly established federal law is
> objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362
> (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations

omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court

will give deference to the state court's decision unless it "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV.  ANALYSIS

### A.  Insufficiency of Evidence

Petitioner claims that there was insufficient evidence to support his conviction on two

counts of attempted second degree murder.  Petitioner bases his claim on the fact that there

were no eyewitnesses to the shooting.   The two victims were unable to make an

identification, the surveillance video was too unclear to identify him as the third shooter, and

the only evidence presented against him "was the self-serving testimony of a federal prisoner,

James Aldridge ... [which was ] completely uncorroborated ... and called into doubt by

defense witness, Powell Miller...."  (Rec. doc. 3, petitioner's supporting memorandum, p. 8).

In addressing the instant claim, the Louisiana Fourth Circuit Court of Appeal first

examined applicable law as enunciated by the Supreme Court in *Jackson v. Virginia*, 443

U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), along with applicable state law.

> The standard of appellate review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).   Either direct or circumstantial evidence may be used to prove the essential elements of the crime.   Ultimately, to support a conviction, the evidence, whether direct or circumstantial or both, must be sufficient under *Jackson* to satisfy any rational

> trier of fact that the defendant is guilty beyond a reasonable doubt. *State v. Sutton,* 436 So.2d 471 (La.1983). As to circumstantial evidence, the rule is that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. Credibility determinations are within the discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. *State v. Vessell,* 450 So.2d 938, 943 (La.1984).

*Johnson*, 33 So.3d at 334.

Next, the Louisiana Fourth Circuit examined the elements of attempted second degree murder, along with the elements of "specific intent".

> To sustain an attempted second degree murder conviction, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. *State v. Bishop,* 01–2548, p. 4 (La.1/14/03), 835 So.2d 434, 437; La. R.S. 14:27; La. R.S. 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1, attempted second degree murder requires proof of a specific intent to kill. *State v. Huizar,* 414 So.2d 741 (La.1982). Specific intent "exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the defendant's actions. *State v. Smith,* 94–2588 (La. App. 4 Cir. 3/27/96), 672 So.2d 1034. Charging the victim in a threatening manner and trying to get at him with a knife over a bar has been found to be evidence of specific intent to kill. *State v. Garner,* 241 La. 275, 128 So.2d 655 (1961). Likewise, the pointing of a gun at the victim as it was fired has been found to be evidence of specific intent to kill. *State v. Procell,* 365 So.2d 484 (La.1978).

*Johnson,* 33 So.3d at 334.

Thereafter, the state appellate court examined the evidence presented at trial.

In this case, the evidence revealed that after Mr. Johnson learned of Mr. Pierce's murder, he told his long time friend Mr. Aldridge that he was going to kill the person responsible for Mr. Pierce's death.  Sometime thereafter, surveillance cameras at the carwash recorded three shooters—later identified as Mr. Washington, Mr. Hooks and Mr. Johnson—firing long barreled weapons at, and seriously wounding, two victims.  In a telephone conversation with Mr. Aldridge after the carwash shooting, Mr. Johnson admitted his participation in the shooting, but stated that he had targeted the wrong people.

Mr. Johnson argues that Mr. Aldridge's testimony was unreliable and self serving because Mr. Aldridge testified in exchange for a promise of leniency in his sentencing on a federal drug and weapons conviction.  Consequently, he contends that the state failed to prove his identity as one of the shooters.

The jury was read Mr. Aldridge's pre-trial hearing testimony.[4]  Mr. Aldridge recounted that he and Mr. Johnson knew one another from the neighborhood and that they saw or spoke to each other on a daily basis.  Mr. Aldridge recognized Mr. Johnson as one of the shooters from Mr. Johnson's physical features.  He also said that he recognized Mr. Johnson on the video as the shooter wearing a black T-shirt, blue shorts, and white tennis shoes.  Mr. Aldridge pointed out that the blue shorts Mr. Johnson was wearing had a fade spot on the front leg.  The blue shorts aided in Mr. Aldridge's identification of Mr. Johnson because Mr. Aldridge purchased them for Mr. Johnson.  Mr. Aldridge admitted that he had entered a plea deal in the federal prosecution, but denied being promised anything with regard to the length of his sentence.

The jury also heard Mr. Miller's testimony regarding his interview with Mr. Aldridge after the pre-trial hearing.  Mr. Miller testified that Mr. Aldridge indicated to him that the reason he testified against Mr. Johnson at the pre-trial hearing was because he believed Mr. Johnson was safer in prison than on the streets.

*Johnson*, 33 So.3d at 334-335.

---

[4]Mr. Aldridge refused to testify at the trial; he invoked his Fifth Amendment privilege.  Mr. Aldridge's pre-trial hearing testimony was read to the jury by a law clerk.

Thereafter, the Louisiana Fourth Circuit reasoned:

> Based on the evidence presented at trial, it was not unreasonable for the jury to decide that the state proved that Mr. Johnson was guilty of attempted second-degree murder. The jury heard the testimony of Mr. Aldridge, who unequivocally identified Mr. Johnson as one of the shooters depicted in the video. Mr. Aldridge's identification came from several years of association with Mr. Johnson, seeing him in their mutual neighborhood frequently, and speaking with him on a daily basis. Moreover, Mr. Aldridge testified that Mr. Johnson admitted to him in a telephone conversation that he (Mr. Johnson) participated in the carwash shooting. This assignment is without merit.

*Johnson*, 33 So.3d at 335.

This court finds that the above reasoning on the part of the Louisiana Fourth Circuit does not represent an unreasonable application of the law enunciated in *Jackson* to the facts of this case. Accordingly, the instant claim for habeas corpus relief is without merit.

### B.  Denied Right to Confront and Cross-Examine Accuser

Petitioner argues that his right to confront and cross-examine his accuser, James Aldridge, was violated "when the trial court allowed ... James Aldridge's testimony from a prior motion-hearing to be read to the jury." According to petitioner, the trial court's ruling in this regard "was based on the erroneous conclusion that Mr. Aldridge became unavailable for the trial simply by asserting his privilege against self-incrimination." (Rec. doc. 3, petitioner's supporting memorandum, p. 10).

In *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177

16

(2004), the Supreme Court undertook an examination of the Sixth Amendment's Confrontation Clause, determining that the admission at trial of testimonial statements from absent witnesses does not run afoul of a petitioner's constitutional right to confront his accusers if:  1) the witness is unavailable and, 2) the defendant has had a prior opportunity to cross-examine the witness.  As shown below, the above two prerequisites have been met in this case.

First, there is no question that Aldridge, by invoking his Fifth Amendment privilege against self-incrimination, was "unavailable".  *See Jackson v. Mississippi Dept. Of Corrections*, 359 Fed. Appx. 499, 502 (5th Cir. 2010) (witness invoked her Fifth Amendment right against self-incrimination and refused to testify, therefore, witness was unavailable and prior sworn testimony was admitted into evidence); *Neuman v. Rivers*, 125 F.3d 315, 319 (6th Cir. 1997) (witness, having invoked his right against self-incrimination, was unavailable to testify at trial.); *Gragg v. Prosper*, 2009 WL 2488132, *11 (E.D. Cal. Aug. 11, 2009 (invocation of Fifth Amendment right against self-incrimination made witness unavailable to offer testimony at trial).

Second, petitioner had a prior opportunity to cross-examine Aldridge in connection with his pre-trial hearing testimony, the testimony that was admitted into evidence at trial.  As the Louisiana Fourth Circuit observed:  "Mr. Johnson was represented by counsel at

the hearing motions. Mr. Aldridge testified under oath at the hearing on motions and was subjected to lengthy and rigorous cross-examination by three defense attorneys." *Johnson*, 33 So.2d at 336.

Based upon the above, this court finds the instant claim to be without merit. Petitioner was not denied his constitutional right to confront and cross-examine James Aldridge.

### C. Jury Misconduct

Petitioner alleges that his right to a fair trial was violated by virtue of jury misconduct. Specifically, petitioner claims that a juror used frame by frame enhancement computer software on his laptop computer when the jury viewed the surveillance videotape footage of the shooting during deliberations. Petitioner argues that he was prejudiced by this enhancement because the surveillance tape was not presented at trial with the enhancement.

The Supreme Court has determined that an evidentiary hearing is warranted when "extrinsic influence or relationships have tainted [jury] deliberations." *Tanner v. United States*, 483 U.S. 107, 120, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90 (1987); *see also Garcia v. Andrews*, 488 F.3d 370, 375 (6th Cir.), *cert. denied*, 552 U.S 994, 128 S.Ct. 493, 169 L.Ed.2d 346 (2007). In accordance therewith, the state district court, in response to

petitioner's jury misconduct claim, conducted an evidentiary hearing.

At the evidentiary hearing, courtroom personnel, Deputy Patricia Bruno and Deputy Sheriff Donald Marshall, testified that during deliberations jurors did, in fact, view the trial surveillance video on one of the juror's laptop computers. *Johnson*, 33 F.3d at 337.[5] However, both Bruno and Marshall stated that they did not see the video during deliberations and had no idea if the images were enhanced or altered in any way. *Id*. at 337-338.

Based upon the above testimony, the state appellate court concluded:

> Although Mr. Johnson characterizes the computer software utilized during jury deliberations as frame by frame enhancement software and thus experimentation that allowed the jury to consider evidence not adduced at trial, there is no evidence to support his contention. Deputy Bruno testified that she did not see the video during deliberations and did not know whether the juror's laptop contained frame by frame enhancing software or whether the images shown were altered in any manner. Likewise, Deputy Marshall testified that he did not see the video during deliberations and did not know whether the laptop computer contained enhancement software. Thus, there is no evidence that the jury viewed the videotape of the shooting with anything other than standard digital video playing software. The jury's conduct was nothing more than pausing a video properly admitted into evidence and properly provided to the jury during their deliberations. Despite that the trial judge, prosecutors, and defense counsel were aware that the jury was going to view the videotape on a juror's laptop computer, no objection was lodged. Even assuming some irregularity on the jury's part, the information supplied by the videotape was

---

[5]The judge, district attorneys and defense counsel, upon being informed that jurors were going to watch the video on a juror's laptop, made no objection. *Id*. at 338.

> merely cumulative to other evidence of Mr. Johnson's guilt introduced at trial.
> This assignment is without merit.

*Johnson*, 33 So.3d at 339.

Thus, the Louisiana Fourth Circuit Court of Appeal determined that no extrinsic evidence, i.e., evidence not presented at trial, was introduced during jury deliberations and, as such, petitioner suffered no violation of his right to a fair trial. This court finds that the state appellate court's conclusion in this regard does not represent an unreasonable application of Supreme Court law to the facts of this case. Accordingly, the instant claim is without merit.

### D.  Incomplete Transcript of Voir Dire

Petitioner argues that his conviction and sentence should be reversed because the transcript of the voir dire proceedings fails to include the bench conferences in which the attorneys exercised their peremptory strikes and their other challenges for cause. (Rec. doc. 3, petitioner's supporting memorandum, p. 20).  In support of his argument, petitioner relies solely on state law, providing that in a situation such as this, "the Louisiana [S]upreme Court has held that a conviction must be reversed." *Id*.

It is well established that federal habeas review is limited to questions of constitutional dimension. *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v.*

*Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28,

141 L.Ed.2d 788 (1998).  As the Supreme Court explained in *Wilson v. Corcoran*, _ U.S.

_, 131 S.Ct. 13, 16, 178 L.Ed.2d 276 (2010):

> [I]t is only noncompliance with *federal* law that renders a State's criminal
> judgment susceptible to collateral attack in the federal courts.  The habeas
> statute unambiguously provides that a federal court may issue the writ to a
> state prisoner "only on the ground that he is in custody in violation of the
> Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).
> And we have repeatedly held that "'federal habeas corpus relief does not lie
> for errors of state law.'"  *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475,
> 116 L.Ed.2d 385 (1991) (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780, 110
> S.Ct. 3092, 111 L.Ed.2d 606 (1990)) [emphasis original].

In a factually similar case, *Kunkle v. Dretke*, 352 F.3d 980 (5th Cir. 2003), *cert.*

*denied*, 543 U.S. 835, 125 S.Ct. 250, 160 L.Ed.2d 56 (2004), Kunkle argued that his

constitutional rights had been violated by virtue of the fact that the State had not provided

him "with a complete transcript of voir dire, free of charge."  In addressing Kunkle's

claim, the Fifth Circuit first set forth the applicable law:

> In *Griffin v. Illinois,* 351 U.S. 12, 19-20, 76 S.Ct. 585, 100 L.Ed. 891 (1956),
> the Supreme Court held that the Due Process and Equal Protection clauses of
> the Fourteenth Amendment require that states provide indigent defendants with
> a trial transcript free of charge when it is necessary for meaningful appellate
> review. However, the state is not "obligated to automatically supply a
> complete verbatim transcript," *Moore v. Wainwright,* 633 F.2d 406, 408 (5th
> Cir.1980), and a State need not waste its funds providing for free those parts
> of the transcript that are not "germane to consideration of the appeal." *Draper
> v. Washington,* 372 U.S. 487, 495, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963). "[N]or
> is the state required to furnish complete transcripts so that the defendants ...

21

may conduct 'fishing expeditions' to seek out possible errors at trial." *Jackson v. Estelle,* 672 F.2d 505, 506 (5th Cir.1982).

*Kunkle*, 352 F.3d at 985-986.

Thereafter, the Fifth Circuit rejected Kunkle's claim, reasoning:

At no time has Kunkle alleged any error that may have been uncovered through the production of those portions of voir dire not included in the record. Rather, Kunkle argues generally that he may have been able to uncover an error of constitutional magnitude had he been provided a complete transcript. In *Jackson,* this Court specifically rejected the idea that a state must provide a complete transcript for purposes of a mere "fishing expedition."  *Id.*

*Kunkle*, 352 F.3d at 986.

In the instant case, as in *Kunkle*, petitioner alleges no error that may have been uncovered through the production of those portions of the voir dire, specifically, the bench conferences, which were not included in the record.  The fact that petitioner believes that he may have uncovered a constitutional error if he had been provided with a transcript of the bench conferences is clearly insufficient for the purpose of attaining federal habeas corpus relief.  Accordingly;

RECOMMENDATION

It is hereby **RECOMMENDED** that the application of petitioner, Antoine Johnson, for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** with prejudice.

22

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[6]

New Orleans, Louisiana, this ___2nd___ day of ___November___, 2011.


LOUIS MOORE, JR.
United States Magistrate Judge

---

[6]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.

23